# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MEE MEE BROWN,<br><br>     Plaintiff,<br><br>  vs.<br><br>JOHN KROLL, Facility Operating Officer at Norfolk Regional Center, In Their Individual Capacities; BEVERLY LEUSHEN, Licensed Administrative Program Therapist, In Their Individual Capacities; KATHY HERRON, Licensed 3-East Unit Supervisor, In Their Individual Capacities; TABITHA WAGGONER, Provisionally Licensed Group Facilitator and Social Worker, In Their Individual Capacities; and RHONDA WILSON, Registered Nurse, In Their Individual Capacities;<br><br>     Defendants. | **8:17CV294**<br><br><br>**MEMORANDUM<br>AND ORDER** |

This matter is before the court on the parties' cross-motions for summary judgment (Filing No. 11 & Filing No. 22).[1] For the reasons that follow, Defendants' Motion for Summary Judgment is granted, and Plaintiff's Motion for Summary Judgment is denied.

---

[1] Also pending is Defendants' Motion to Strike (Filing No. 26) two "affidavits" that Plaintiff submitted in support of her Motion for Summary Judgment. However, even with these "affidavits," Plaintiff does not bring enough evidence to defeat Defendants' summary judgment motion. Accordingly, the court denies as moot Defendants' Motion to Strike (Filing No. 26).

# I. BACKGROUND

Plaintiff Mee Mee Brown ("Brown") filed this action pursuant to 42 U.S.C. § 1983 against Defendants John Kroll ("Kroll"), Beverly Lueshen ("Lueshen"),[2] Kathy Herian ("Herian")[3], Tabetha[4] Waggoner ("Waggoner"), and Rhonda Wilson ("Wilson"), who are employed at the Norfolk Regional Center ("NRC") where Brown was committed for inpatient sex offender treatment.[5] After an initial review of the Complaint (Filing No. 1) and Brown's Motion to Amend Complaint (Filing No. 6), the court allowed the following claims to proceed:

   a.    An equal protection claim against Defendants Lueshen, Wilson, Herian, and Waggoner for directing other NRC patients not to associate with Brown because of her transgender identity.

   b.    A First Amendment retaliation claim against Defendant Herian for giving Brown negative treatment scores in response to Brown changing her name and wearing a bra as expressions of her transgender identity.

   c.    A First Amendment retaliation claim against Defendant Herian for giving Brown negative treatment scores in response to Brown's filing Case No. 8:16CV569.

---

[2] Throughout this order, the court has corrected the spelling of "Leushen" to "Lueshen."

[3] Throughout this order, the court has corrected the spelling of "Herron" to "Herian."

[4] The correct spelling of Waggoner's first name is "Tabetha."

[5] Brown was transferred to the Lincoln Regional Center ("LRC") on February 28, 2018. *See* docket entry dated March 16, 2018; *Brown v. Dawson*, Filing No. 61, Case No. 8:16CV569 (D. Neb.).

> d.    A First Amendment retaliation claim against Defendant Waggoner for writing negative entries and low treatment scores in Brown's treatment plan and for forwarding negative untrue entries to the mental health board in response to Brown's filing Case No. 8:16CV569.[6]
>
> e.    A First Amendment retaliation claim against Defendant Kroll for directing staff to chart and monitor Brown's activities and for denying or ignoring purchase order requests in response to Brown's filing Case No. 8:16CV569.

(Filing No. 8 at CM/ECF pp. 15, 18.)[7]

Shortly after Defendants filed their Answer (Filing No. 10), Defendants filed their Motion for Summary Judgment (Filing No. 11) on November 29, 2017. In support of their Motion, Defendants filed a Brief and an Index of Evidence. (Filing No. 12 & Filing No. 13.) On January 22, 2018, Brown filed her own Motion for Summary Judgment (Filing No. 22) and an Index of Evidence (Filing No. 23), which included as an exhibit her "Objection to Defendants' Motion for Summary Judgment" (Filing No. 23 at CM/ECF pp. 29-32).[8] Defendants filed a Brief in Opposition (Filing No. 25) to Brown's Motion for Summary Judgment.

---

[6] This claim was inadvertently omitted from the order portion of the October 10, 2017 initial review order. (*Compare* Filing No. 8 at CM/ECF p. 15 *with* Filing No. 8 at CM/ECF p. 18.)

[7] The court denied Brown's Motion to Amend Complaint (Filing No. 6). (Filing No. 8 at CM/ECF p. 18.)

[8] Brown's "Objection to Defendants' Motion for Summary Judgment" was not filed properly. *See* NECivR 7.1(b)(1)(A) ("The party opposing a motion must not file an "answer," "opposition," "objection," or "response," or any similarly

(continued on next page)

The party seeking the entry of summary judgment in its favor must set forth "a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a)(1). This statement of facts "should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, . . . or other materials that support the material facts stated in the paragraph." NECivR 56.1(a)(2). If the non-moving party opposes the motion, that party must "include in its [opposing] brief a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). Such response must "address each numbered paragraph in the movant's statement" of facts and must contain pinpoint citations to evidence supporting the opposition. *Id.* "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." *Id.*; *see also* Fed. R. Civ. P. 56(e) ("A supporting or opposing affidavit must be made on personal

---

titled responsive filing. Rather, the party must file a brief that concisely states the reasons for opposing the motion and cites to supporting authority.") Furthermore, it was untimely. Brown's "Objection to Defendants' Motion for Summary Judgment" is dated January 16, 2018 (Filing No. 23 at CM/ECF p. 32), and was filed on January 22, 2018, which is four days after the January 18, 2018 deadline by which Brown was required to respond. (*See* Filing No. 15.) In addition, although Brown did file her own Motion for Summary Judgment, she did not submit a separate, supporting brief in compliance with the court's Local Rules. *See* NECivR 7.1(a)(1)(A) ("A motion raising a substantial issue of law must be supported by a brief filed and served together with the motion. The brief must be separate from, and not attached to or incorporated in, the motion or index of evidence."). Brown is cautioned that, in the future, she must comply with the Federal Rules of Civil Procedure and the court's Local Rules. *See* NEGenR 1.3(g) (pro se litigants are "bound by and must comply with all local and federal procedural rules"); *Schooley v. Kennedy*, 712 F.2d 372, 373 (8th Cir. 1983) (per curiam) (concluding pro se litigants are not excused from compliance with procedural and local rules).

knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.").

Defendants have submitted a statement of material facts in accordance with the court's Local Rules and properly authenticated evidence. Brown's "Objection to Defendants' Motion for Summary Judgment"—in addition to not being filed properly in accordance with the Local Rules—does not contain a concise response to each of Defendants' statements of material fact. *See* NECivR 56.1(b)(1). Furthermore, Brown's own Motion for Summary Judgment includes a statement of material facts, but does not contain "pinpoint references" to "materials that support the material facts stated in the paragraph[s]." *See* NECivR 56.1(a)(2). Nonetheless, Defendants have responded to each of Brown's statements of material fact in accordance with the court's Local Rule.

Thus, while Defendants submitted a statement of material facts in accordance with the court's Local Rules, Brown has not. In light of this, the court adopts the following undisputed material facts, which are largely taken from Defendants' submission and have not been properly disputed pursuant to the Federal and Local Rules.

## II. RELEVANT UNDISPUTED MATERIAL FACTS

1. The Nebraska Department of Health and Human Services ("DHHS") administers the clinical programs and services of the LRC and the NRC. Neb. Rev. Stat. § 83-101.06.

2. The DHHS supervises the LRC and the NRC. Neb. Rev. Stat. § 83-107.01.

3. The state hospital for the mentally ill established in Madison County, Nebraska is known as the NRC. Neb. Rev. Stat. § 83-305.

4.     The state hospital for the mentally ill established in Lancaster County, Nebraska is known as the LRC. Neb. Rev. Stat. § 83-305.

5.     On December 19, 2013, Brown was committed to the DHHS for inpatient sex offender treatment by the Douglas County Mental Health Board after being identified as a dangerous, untreated sex offender. (Filing No. 13-1 at CM/ECF p. 1, ¶ 5.)

6.     Brown was a patient at the NRC from December 2013 through September 2015. (Filing No. 13-1 at CM/ECF p. 2, ¶ 6.)

7.     Brown was a patient at the LRC from September 2015 until Brown's readmission to the NRC in October 2016. (Filing No. 13-1 at CM/ECF p. 2, ¶ 7.)

8.     Brown was returned to the NRC because of repeated threats of aggression and refusal to follow a safety plan after it was discovered that Brown had been involved in a sexual relationship with a peer. (Filing No. 13-1 at CM/ECF p. 2, ¶ 8.)

**John Kroll**

9.     Kroll has been the Facility Operating Officer for the NRC since July 1, 2017. Kroll served as the Interim Facility Operating Officer at the NRC from January 2017 until July 1, 2017. Kroll served as the Director of Nursing at the NRC from January 1989 to January 2017. (Filing No. 13-1 at CM/ECF p. 1, ¶ 3.)

10.     Kroll has been employed by the NRC for approximately 41 years. (Filing No. 13-1 at CM/ECF p. 1, ¶ 4.)

11.     Kroll is not involved in any decisions regarding Brown's treatment level, treatment progression, or entries on Brown's treatment chart. (Filing No. 13-1 at CM/ECF p. 2, ¶ 9.)

12.     Kroll never directed NRC staff members to chart or monitor Brown's conversations or calls to outside media or family into Brown's treatment chart. ([Filing No. 13-1 at CM/ECF p. 2](#), ¶ 10.)

13.     As a member of the NRC administration, Kroll denied one purchase order request submitted by Brown. Brown requested to purchase a silicone bra. The request was initially approved by the treatment team, but was denied by the NRC administration due to safety and security concerns. Since being readmitted to the NRC, Brown has been approved to wear female undergarments. The NRC administration determined the silicone bra request went beyond the approved undergarments. The NRC is a mental hospital which treats patients with histories of deviant sexual behaviors, who may also be criminal offenders. The NRC administration was concerned a silicone bra would draw more attention to Brown, and would place Brown's safety and security at risk from other patients. The NRC administration was also concerned the request would interfere with the treatment of other patients. ([Filing No. 13-1 at CM/ECF pp. 2-3](#), ¶ 11.)

14.     Kroll did not deny any other purchase order requests made by Brown. To Kroll's knowledge, this was the only purchase order request made by Brown that was denied after readmission to the NRC. ([Filing No. 13-1 at CM/ECF pp. 2-3](#), ¶ 11.)

15.     The NRC is required to account for the whereabouts and provide security for its patients. It is the policy of the NRC that all patients must be accounted for at all times. Patient counts are performed throughout the day. The nursing service staff conduct a check of each patient's whereabouts a minimum of once every 30 minutes and record this information. If patients are in their room during a check, they must be observed for life signs, such as breathing or body movement. If staff are unable to see life signs, they will knock on the patient's door and open it for further assessment. ([Filing No. 13-1 at CM/ECF p. 3](#), ¶ 12.)

16.     Patients during the day are required to have their white room curtains open 2/3 of the way in their window unless they are engaging in privacy activities. If staff are conducting the roll call of patients and patients have their white curtain up on their room, staff will knock on the patient's door. If the patients say they are busy, staff give them five minutes. After the five minutes, staff knock on the door, and if the patients refuse to come to the door or take the white curtain down, staff advise the patients they must open the door in one minute. It is essential that staff be able to verify patients are in their room and what they are doing. (Filing No. 13-1 at CM/ECF p. 3, ¶ 13.)

17.     Patients are required to remove their white room curtains every night by 23:00 hours and place the curtains on their dresser, or the curtains will be removed by staff and placed on the patient's dresser. (Filing No. 13-1 at CM/ECF p. 3, ¶ 14.)

18.     Brown is not treated any differently regarding patient supervision and staff checks than any other patient. (Filing No. 13-1 at CM/ECF p. 3, ¶ 15.)

19.     Kroll does not remember the date in which he was served with the lawsuit in Case No. 8:16CV569. (Filing No. 13-1 at CM/ECF p. 4, ¶ 17.)

20.     Brown is not the first patient to sue Kroll. (Filing No. 13-1 at CM/ECF p. 4, ¶ 18.)

21.     Kroll is not offended when a patient files a lawsuit against him. (Filing No. 13-1 at CM/ECF p. 4, ¶ 19.)

22.     Kroll believes Brown has the right to file a lawsuit. (Filing No. 13-1 at CM/ECF p. 4, ¶ 20.)

23.     It is the policy of the NRC to investigate each written grievance submitted by a patient and meet with and/or respond to the patient within 12

calendar days from the date the grievance was received, unless additional time is necessary for adequate investigation. If more time is needed, the patient is notified in writing. Kroll reviewed the records of grievances submitted by Brown, and determined all grievances were responded to within 12 days. (Filing No. 13-1 at CM/ECF p. 4, ¶ 21.)

### Beverley Lueshen

24.     Lueshen has been employed at the NRC since September 1986. (Filing No. 13-2 at CM/ECF p. 1, ¶ 3.)

25.     Lueshen is a Licensed Mental Health Practitioner and Licensed Drug and Alcohol Counselor in the State of Nebraska. Lueshen has held these positions for approximately 19 years. (Filing No. 13-2 at CM/ECF p. 1, ¶ 4.)

26.     Lueshen never threatened other patients with "no contact" orders or "negative treatment scores" if they interacted with Brown. (Filing No. 13-2 at CM/ECF p. 1, ¶ 5.)

27.     Lueshen never issued a "no contact" order regarding Brown. (Filing No. 13-2 at CM/ECF p. 1, ¶ 6.)

28.     Lueshen would not have the authority to issue any such "no contact" order by herself. A "no contact" order involving an NRC patient would have to be made by the entire treatment team. (Filing No. 13-2 at CM/ECF p. 2, ¶ 7.)

29.     Lueshen is involved in the scoring of treatment plans for other patients. Her scoring is based upon that patient's behaviors. The purpose of treatment plan scoring is to address treatment issues with the patient being scored. Treatment plan scoring is not intended to prevent Brown from interacting with other patients, or to punish Brown. (Filing No. 13-2 at CM/ECF p. 2, ¶ 8.)

30.     Treatment plan scores are not intended to be "negative" toward the patient. Treatment plan scoring is a tool to determine a patient's treatment progress. Treatment plan scores are intended to assist the patient in determining what areas of treatment require more effort or work. (Filing No. 13-2 at CM/ECF p. 2, ¶ 9.)

31.     Lueshen never said, "Mee Mee thinks he's a girl and that's a distortion that will keep him here in treatment longer because he's capable of re-offending." Lueshen would never say anything like that. (Filing No. 13-2 at CM/ECF p. 2, ¶ 10.)

32.     Lueshen never said to other patients, "I can see Mee Mee being in treatment for awhile [sic] because he likes to file lawsuits against staff, and his lawsuits are going nowhere, this ain't [sic] good for his treatment. . . . You should not be sitting next to or eating with Mee Mee. You both will be charted on, and this will reflect [sic] your treatment plan review." Lueshen would never say anything like that. (Filing No. 13-2 at CM/ECF p. 2, ¶ 11.)

33.     Lueshen never discussed Brown's lawsuits or treatment with other patients. (Filing No. 13-2 at CM/ECF p. 2, ¶ 12.)

34.     Lueshen never warned other patients they should not be sitting with or eating with Brown. (Filing No. 13-2 at CM/ECF p. 2, ¶ 13.)

35.     Patients are allowed to sit or eat with whomever they want unless there is an order preventing such activity issued by the entire treatment team. Lueshen is not aware of any such order involving Brown. To the best of Lueshen's knowledge, Brown was allowed to sit and eat with any other patient at the NRC. (Filing No. 13-2 at CM/ECF p. 3, ¶ 14.)

36.     Lueshen never told other patients they would be "charted on" if they sat with or ate with Brown. (Filing No. 13-2 at CM/ECF p. 3, ¶ 15.)

37.     Lueshen does not care whether Brown sits or eats with other patients, and she does not care which patients Brown sits or eats with. ([Filing No. 13-2 at CM/ECF p. 3](), ¶ 16.)

38.     Lueshen never prevented another patient from advancing in treatment because they interacted with Brown. ([Filing No. 13-2 at CM/ECF p. 3](), ¶ 17.)

39.     Lueshen never told another patient not to associate with Brown because Brown identifies as transgendered. ([Filing No. 13-2 at CM/ECF p. 3](), ¶ 18.)

40.     Lueshen never discussed Brown's transgender identity with another patient. ([Filing No. 13-2 at CM/ECF p. 3](), ¶ 19.)

41.     Lueshen does not care if Brown identifies as transgendered. ([Filing No. 13-2 at CM/ECF p. 3](), ¶ 20.)

42.     Lueshen believes Brown has the right to file a lawsuit. ([Filing No. 13-2 at CM/ECF p. 3](), ¶ 21.)

43.     Lueshen does not care if Brown files a lawsuit. ([Filing No. 13-2 at CM/ECF p. 3](), ¶ 22.)

## Kathy Herian

44.     Herian has been a Licensed Nurse in the State of Nebraska since 1970. Herian has been a Certified Mental Health Nurse by the American Nurses Association since 1990. ([Filing No. 13-3 at CM/ECF p. 1](), ¶ 3.)

45.     Herian has been employed at the NRC since 1979. ([Filing No. 13-3 at CM/ECF p. 1](), ¶ 4.)

46.     Herian has been a Registered Nurse Supervisor at the NRC since 1990. ([Filing No. 13-3 at CM/ECF p. 1](), ¶ 5.)

47.     Herian has been the Unit 3 East Supervisor of the NRC since January 2017. ([Filing No. 13-3 at CM/ECF p. 1](), ¶ 6.)

48.     Herian rarely interacted with Brown. Brown was not a ward on a unit that Herian supervised at the NRC. Brown was a ward on Unit 3 West, while Herian was the supervisor of Unit 3 East. ([Filing No. 13-3 at CM/ECF p. 1](), ¶ 7.)

49.     Herian was not a member of Brown's treatment team. Herian did not participate in the scoring of Brown's treatment plans. Herian never "negatively" scored Brown's treatment plans. Treatment plan scores are not intended to be negative. Treatment plan scores are intended to reflect a patient's treatment progress. ([Filing No. 13-3 at CM/ECF p. 2](), ¶ 8.)

50.     Herian was not involved in the determination of Brown's treatment level. Herian was not aware of Brown's treatment level until she read the allegations in this lawsuit. Herian had no reason to know Brown's treatment level because Brown did not reside on Herian's unit. Herian would have no reason to know whether Brown progressed in treatment level for that reason. ([Filing No. 13-3 at CM/ECF p. 2](), ¶ 9.)

51.     Herian checked the facility records and could not locate any documentation to establish she interacted with Brown on June 13, 2017, which is the date Brown alleges Herian said, "Do not be using my unit staff to do anything involving this lawsuit that you got going on. You need to be sending that stuff to the treatment team. This lawsuit crap is not gonna [sic] move you forward here, it's only gonna [sic] set you back longer. So if you wanna [sic] be here longer, then keep this up. And you and the patients helping you will all have 10 ft. no contact orders placed on both of you." ([Filing No. 13-3 at CM/ECF p. 2](), ¶ 10.)

52.     Herian does not have the authority to issue a "10 ft. no contact order." Only the treatment team would have the authority to issue that kind of an order. ([Filing No. 13-3 at CM/ECF p. 2](), ¶ 11.)

53.     Herian never discussed Brown's treatment or lawsuits with other patients. ([Filing No. 13-3 at CM/ECF p. 2](), ¶ 12.)

54.     Herian was not at work at the NRC on June 19, 2017, the date Brown alleges that Herian said, "You were Cornelius when you came here, now you want us to call you Mee Mee? I may just keep calling you Cornelius." ([Filing No. 13-3 at CM/ECF p. 2](), ¶ 13.)

55.     Herian is aware Brown's first name was legally changed from Cornelius to Mee Mee; Herian uses Brown's legal name. ([Filing No. 13-3 at CM/ECF p. 3](), ¶ 14.)

56.     Herian never threaten or warned other patients not to associate with Brown. ([Filing No. 13-3 at CM/ECF p. 3](), ¶ 15.)

57.     Herian believes Brown has the right to file a lawsuit. ([Filing No. 13-3 at CM/ECF p. 3](), ¶ 17.)

58.     Herian does not care if Brown files a lawsuit. ([Filing No. 13-3 at CM/ECF p. 3](), ¶ 18.)

59.     Herian never prevented a patient from advancing in treatment because they associated with Brown. ([Filing No. 13-3 at CM/ECF p. 3](), ¶ 19.)

60.     Herian never told a patient not to associate with Brown because Brown identifies as transgendered. ([Filing No. 13-3 at CM/ECF p. 3](), ¶ 20.)

61.     Herian never discussed Brown's transgender identity with another patient. ([Filing No. 13-3 at CM/ECF p. 3](#), ¶ 21.)

62.     Herian does not care if Brown identifies as transgendered or wears female undergarments. ([Filing No. 13-3 at CM/ECF p. 3](#), ¶ 22.)

**Tabetha Waggoner**

63.     Waggoner has been employed at the NRC since December 2015. ([Filing No. 13-4 at CM/ECF p. 1](#), ¶ 3.)

64.     At all times relevant, Waggoner was a provisionally licensed Master Social Worker at the NRC. ([Filing No. 13-4 at CM/ECF p. 1](#), ¶ 4.)

65.     From approximately October 2016 through July 2017, Waggoner was one of the group facilitators for the sex offender treatment group therapy attended by Brown at the NRC. Waggoner rarely interacted with Brown after July 2017. ([Filing No. 13-4 at CM/ECF p. 1](#), ¶ 5.)

66.     During her time as a group facilitator, Waggoner participated in the scoring of Brown's treatment plan. Her treatment plan scoring was not intended to be "low" or "negative" toward Brown. The purpose of the scoring was to review Brown's treatment plan and report the group therapy treatment progress Brown made during the reporting period. The scoring was unrelated to Brown's gender identity. Approximately every two months, Waggoner and the other group facilitator would submit a synopsis of Brown's group therapy treatment progress to the treatment team. The entire treatment team would then work on treatment plan scoring together before submitting it to the mental health board. ([Filing No. 13-4 at CM/ECF pp. 1-2](#), ¶ 6.)

67.     Waggoner never submitted any scoring to the mental health board herself. Waggoner recalls reporting that Brown's progress in group therapy

treatment had improved during her involvement. (Filing No. 13-4 at CM/ECF p. 2, ¶ 6.)

68.     During her time as a group facilitator, Waggoner sometimes made entries on Brown's chart regarding treatment progress. The entries were not intended to be "negative," but were factual information intended to track Brown's treatment progress. Waggoner never forwarded any entries to the mental health board herself. (Filing No. 13-4 at CM/ECF p. 2, ¶ 7.)

69.     Waggoner never told other patients that Brown "thinks he is a female and you guys should be careful hanging out with him so much that will keep you here longer." Waggoner would never say anything like that to another patient. (Filing No. 13-4 at CM/ECF p. 2, ¶ 8.)

70.     Waggoner never discussed Brown's treatment or gender identity with another patient. (Filing No. 13-4 at CM/ECF p. 2, ¶ 9.)

71.     Waggoner recalls that Brown approached her on one occasion and asked if she knew the status of a request Brown had made to order a bra. Waggoner advised Brown she was unsure of the status, but knew it was being discussed. Waggoner advised Brown that she supported the request to purchase a bra. Waggoner did not have the authority to approve or deny this request herself. (Filing No. 13-4 at CM/ECF p. 2, ¶ 11.)

72.     Waggoner does not care if Brown interacts with other patients as long as the interactions are appropriate and show healthy boundaries. It is part of her job duties to point out if patient interaction is inappropriate or lacks healthy boundaries. (Filing No. 13-4 at CM/ECF p. 3, ¶ 12.)

73.     Waggoner never threatened or warned other patients not to associate with Brown. Waggoner encouraged one patient on her case load to maintain healthy boundaries with Brown, but this encouragement was related to that

patient's treatment and was unrelated to Brown's gender identity or lawsuits. ([Filing No. 13-4 at CM/ECF p. 3](), ¶ 13.)

74.     Waggoner believes Brown has the right to file a lawsuit. ([Filing No. 13-4 at CM/ECF p. 3](), ¶ 15.)

75.     Waggoner does not care if Brown files a lawsuit. ([Filing No. 13-4 at CM/ECF p. 3](), ¶ 16.)

76.     Waggoner never prevented a patient from advancing in treatment because the patient associated with Brown. ([Filing No. 13-4 at CM/ECF p. 3](), ¶ 17.)

77.     Waggoner never told a patient not to associate with Brown because Brown identifies as transgendered or filed a lawsuit. ([Filing No. 13-4 at CM/ECF p. 3](), ¶ 18.)

78.     Waggoner does not care if Brown identifies as transgendered. ([Filing No. 13-4 at CM/ECF p. 3](), ¶ 19.)

## **Rhonda Wilson**

79.     Wilson has been a Licensed Registered Nurse for approximately ten years. ([Filing No. 13-5 at CM/ECF p. 1](), ¶ 3.)

80.     Wilson has been employed by the State of Nebraska for approximately ten years. ([Filing No. 13-5 at CM/ECF p. 1](), ¶ 4.)

81.     Wilson has been employed at the NRC as a Registered Nurse (RN) since July 2016. ([Filing No. 13-5 at CM/ECF p. 1](), ¶ 5.)

82.     Wilson rarely interacted with Brown. Wilson only made one entry on Brown's chart during her NRC employment, and that entry was made in May 2017 regarding an unrelated health issue. (Filing No. 13-5 at CM/ECF p. 1, ¶ 6.)

83.     Wilson never made an untruthful entry on any patient's chart. (Filing No. 13-5 at CM/ECF p. 1, ¶ 7.)

84.     Brown alleges Wilson made an entry on Brown's chart on July 27, 2017. Wilson would not have made any such entry because she was not working on Brown's unit that day. Brown was a ward on Unit 3 East that day. Wilson was working on Unit 2 East that day. (Filing No. 13-5 at CM/ECF p. 2, ¶ 8.)

85.     Wilson was on vacation with her family in Niobrara, Nebraska on July 28, 2017, which is when Brown alleges that Wilson said, "Ain't [sic] you suing the staff here at NRC? What are you trying to get? If you think filing lawsuits is gonna [sic] get you out, or help you wear women's clothes, that ain't [sic] happening. So file all the lawsuits you want to, ain't [sic] no one gonna [sic] help you." (Filing No. 13-5 at CM/ECF p. 2, ¶ 9.)

86.     Wilson never discussed Brown's lawsuits or requests to wear female clothing with Brown. (Filing No. 13-5 at CM/ECF p. 2, ¶ 10.)

87.     Wilson never threatened or warned other patients not to associate with Brown. Wilson once had a discussion with a patient regarding boundary issues with Brown. Wilson was not the patient's assigned RN. Wilson referred the patient to his assigned RN. (Filing No. 13-5 at CM/ECF p. 2, ¶ 12.)

88.     Wilson believes Brown has the right to file a lawsuit. (Filing No. 13-5 at CM/ECF p. 2, ¶ 13.)

89.     Wilson does not care if Brown files a lawsuit. (Filing No. 13-5 at CM/ECF p. 2, ¶ 14.)

90.     Wilson never prevented a patient from advancing in treatment because the patient associated with Brown. (Filing No. 13-5 at CM/ECF p. 2, ¶ 15.)

91.     Wilson never told a patient not to associate with Brown because Brown identifies as transgendered. (Filing No. 13-5 at CM/ECF p. 2, ¶ 16.)

92.     Wilson never discussed Brown's transgender identity with another patient. (Filing No. 13-5 at CM/ECF p. 3, ¶ 17.)

93.     Wilson does not care if Brown identifies as transgendered or wants to wear female clothes. (Filing No. 13-5 at CM/ECF p. 3, ¶ 18.)

## III.  ANALYSIS

### A.  Standard of Review

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 949 (8th Cir. 2012). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate allegations with "'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially, the test is

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A party opposing summary judgment "may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial, and must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 256-57 (quotations omitted); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-60 (1970).

## B. Qualified Immunity

Defendants argue that they are entitled to summary judgment because they are immune from suit in their individual capacities under the doctrine of qualified immunity. "Qualified immunity shields government officials from liability for civil damages and the burdens of litigation 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Stated another way, qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information that the defendant possessed." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (internal quotation and citation omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.*

Qualified immunity requires a two-part inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009). If no reasonable fact-finder could answer yes to both of these questions, the official is entitled to

qualified immunity. *Id.* "Courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009).

Accordingly, in reviewing this motion, the court will first examine whether the facts as alleged by Brown reasonably show that the individually-named Defendants have violated Brown's constitutional rights. If the facts do not show a violation, the court need not proceed further with the qualified immunity analysis.

## C. Equal Protection Claims

Brown claims that Defendants Lueshen, Wilson, Herian, and Waggoner violated the Equal Protection Clause's prohibition against sex-based discrimination by warning and threatening other NRC patients not to associate with Plaintiff because of her transgender identity.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The purpose of the Equal Protection Clause "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 611 (2008) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). Proof that discriminatory intent was a motivating factor is required to show a violation of the Equal Protection Clause. *Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

A plaintiff can establish an equal protection "class of one" claim by alleging that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564; *see also Flowers v. City of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009). To prevail under this theory, a plaintiff must show that (1) he or she is a member of an identifiable class; (2) he or she was intentionally treated differently

from others similarly situated; and (3) there is no rational basis for the difference in treatment. *Olech*, 528 U.S. at 564. A defendant's treatment of the plaintiff must be balanced against penological or institutional interests like safety and protection from violence. *See Fegans v. Norris*, 537 F.3d 897, 906 (8th Cir. 2008) (inmate's equal protection claim failed when prison had valid penological interests of safety and security for differing hair-length rules for men and women); *Tates v. Blanas*, No. S-00-2539, 2003 WL 23864868, at *10 (E.D. Cal. Mar. 11, 2003) ("With regard to [transsexual detainee's request for a] bra, the possibility that it could be misused as a weapon or noose must be balanced against any medical or psychological harm to him resulting from denial of a bra"; defendants may not "apply a categorical rule . . . that denies an inmate a bra simply because he is a transgender or is housed in a men's ward").

Brown claims disparate treatment based on her inability to associate with other patients at the NRC due to warnings and threats that allegedly were issued by Defendants Lueshen, Wilson, Herian, and Waggoner. Brown presents no evidence supporting her assertions. Defendants Lueshen, Wilson, Herian, and Waggoner have presented evidence, through affidavits, that they did not threaten or warn other patients not to associate with Brown because of her transgender identity. Defendants have also submitted evidence that they did not issue a "no contact" order between Brown and another patient because of Brown's transgender identity.[9] Brown has presented no evidence that contradicts this evidence. Instead, Brown simply reiterates her allegations in the Complaint and argues that Defendants' statements in their affidavits are "misleading" and "untrue." (*See generally* Filing No. 22 & Filing No. 23.) But that is not how summary judgment works: a party opposing summary judgment "may not rest upon the mere allegation or denials of h[er] pleading, but must set forth specific facts showing that there is a genuine issue for trial, and must present affirmative evidence in

---

[9] The evidence establishes that only the treatment team has the authority to issue "no contact" orders; the individual Defendants do not have the authority to issue "no contact" orders on their own.

order to defeat a properly supported motion for summary judgment." *Ingrassia*, *825 F.3d at 896* (quoting *Anderson*, *477 U.S. at 256-57*).

Taking the evidence in the light most favorable to Brown, at best she could establish that she was prevented from associating with another patient during "patient hour" and/or was prevented from living on the same unit as another patient because Brown and that patient had "bad boundaries" and/or there was a concern about patient safety. There is no evidence, however, that the "bad boundaries" determination was related to Brown's transgender identity. Rather, the evidence establishes that contact between patients is limited if their interactions are inappropriate or their boundaries are unhealthy. Thus, to the extent Brown's contact with another patient was restricted, the evidence indicates it was because their interaction was inappropriate or lacked healthy boundaries. It is undisputed that Brown has a history of inappropriate contact with other patients. Indeed, Brown was returned to the NRC because of repeated threats of aggression and refusal to follow a safety plan after it was discovered that Brown had been involved in a sexual relationship with a peer. There is simply no evidence, beyond Brown's own allegations, that Defendants Lueshen, Wilson, Herian, and Waggoner prevented Brown from associating with other patients because of Brown's transgender identity.

More importantly, however, Brown has not shown that she was treated differently from other NRC patients. She has not shown that she is the only patient who has been given "boundaries." Furthermore, even if Brown was treated differently from other "similarly situated" patients, Defendants have shown a rational basis for any such dissimilar treatment: to maintain appropriate interactions and healthy boundaries between patients in order to ensure the safety and security and the treatment progression of all patients. The NRC is a mental hospital which treats patients with histories of deviant sexual behaviors, who may also be criminal offenders. Defendants have offered evidence that Brown and another NRC patient had "bad boundaries." Brown has presented no evidence to the contrary. Thus, to the extent Defendants limited or prevented Brown from

associating with certain patients, they have shown legitimate reasons for doing so. When restrictions imposed on patients are "reasonable," their "right to equal protection has not been violated." *See Hosna v. Groose*, 80 F.3d 298, 305 (8th Cir. 1996).

## D. First Amendment Retaliation Claims

Next, Brown claims that Defendants Herian, Kroll, and Waggoner retaliated against her for filing Case No. 8:16CV569. In addition, Brown asserts that Defendant Herian retaliated against her for changing her name and wearing a bra as expressions of her transgender identity. Brown alleges the following retaliatory conduct: Herian gave Brown negative treatment scores; Waggoner wrote negative entries and low treatment scores in Brown's treatment plan and forwarded negative untrue entries to the mental health board; and Kroll directed staff to chart and monitor Brown's activities and denied or ignored Brown's purchase order requests.

To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) she engaged in protected activity; (2) the government official took adverse action against her that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity. *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014); *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004); *Naucke v. City of Park Hills*, 284 F.3d 923, 927-28 (8th Cir. 2002). The retaliatory conduct itself need not be a constitutional violation; the violation is acting in retaliation for the exercise of a constitutionally protected right. *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013). Further, "[t]o prevail in an action for First Amendment retaliation, [a plaintiff] must show a causal connection between [the defendant's] retaliatory animus and [the plaintiff's] subsequent injury." *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007) (citing *Hartman v. Moore*, 547 U.S. 250 (2006)).

Defendants Herian, Kroll, and Waggoner do not dispute that filing a lawsuit constitutes engagement in an activity protected under the First Amendment. It is well established that the right to file a legal action is protected under the First Amendment. *Spencer*, 738 F.3d at 911. The law is also settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for speaking out. *Peterson*, 754 F.3d at 602. In addition, Defendant Herian does not dispute that Brown changing her name and wearing a bra as expressions of her transgender identity constitute protected speech under the First Amendment. Defendants do dispute, however, that Brown can prove the other two essential elements of her retaliation claims.

With respect to the second prong, the ordinary-firmness test is well established in the case law and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment. *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003). The test is an objective one, not subjective. *Id.* at 729. The question is not whether the plaintiff was deterred, though how the plaintiff acted might be evidence of what a reasonable person would have done. *Id.* The question is what a person of ordinary firmness would have done. *Id.*

Under the third prong of the First Amendment retaliation claim test, a plaintiff must show that the retaliatory motive was a "substantial factor" or "but-for cause" of the adverse action. *Peterson*, 754 F.3d at 602. In other words, a plaintiff must show he or she was singled out because of exercise of constitutional rights. *Id.* The causal connection between the adverse action and the protected activity is generally a jury question, but it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury. *Revels*, 382 F.3d at 876.

## **Herian**

There is no evidence that Herian gave Brown "negative" treatment scores in

retaliation for Brown's filing Case No. 8:16CV569 or for changing her name and wearing a bra as expressions of her transgender identity. As an initial matter, treatment plan scores are not intended to be "negative"; rather, they are intended to reflect a patient's treatment progress. In addition, Defendant Herian has submitted evidence, through an affidavit, that she was not a member of Brown's treatment team and did not participate in the scoring of Brown's treatment plans. The evidence further shows that Herian was not involved in the determination of Brown's treatment level or even aware of Brown's treatment level until she read the allegations in this lawsuit. Herian had no reason to know Brown's treatment level because Brown did not reside on Herian's unit. Brown has presented no evidence, beyond her own allegations, that contradicts this evidence.[10]

Furthermore, Brown has not presented evidence that she suffered negative consequences as a result of any scoring by Herian. There is no evidence that Brown was prevented from using the name Mee Mee, wearing a bra, or filing this lawsuit. Finally, there is no evidence that Herian was motivated to take adverse action based on Brown's exercise of her First Amendment rights. Indeed, Herian knew Brown had a right to file lawsuits and did not care whether Brown exercised that right.[11] Herian also did not care if Brown identified as transgendered and wore female undergarments. Herian did not object to Brown being called Mee Mee.[12]

---

[10] Brown has included in her Index of Exhibits a November 7, 2016, Suicide Assessment Scale, which is signed by Herian and others. (Filing No. 23 at CM/ECF pp. 4-5.) There is no evidence that suicide risk assessments are "treatment plans" or that they constitute treatment plan "scoring." As such, this evidence fails to dispute that Herian did not participate in the scoring of Brown's treatment plans.

[11] Brown alleges that, on June 13, 2017, Herian told Brown that filing lawsuits would hinder her treatment progression, but the evidence indicates that Herian did not interact with Brown on that date.

[12] Although Brown alleges that, on June 19, 2017, Herian said, "You were Cornelius when you came here, now you want us to call you Mee Mee? I may just

(continued on next page)

Herian knew Brown's first name was legally changed from Cornelius to Mee Mee, and Herian used Brown's legal name. There is simply no evidence that the alleged "negative" scores were related to Brown's filing Case No. 8:16CV569 or for changing her name and wearing a bra.

### Kroll

Brown has also provided no competent evidence that, in retaliation for her filing Case No. 8:16CV569, Kroll directed staff to chart and monitor Brown's activities and denied or ignored Brown's purchase order requests.

Defendant Kroll has submitted evidence, through an affidavit, that he never directed NRC staff members to chart or monitor Brown's conversations or calls to outside media or family into Brown's treatment chart. Indeed, Kroll avers that he was not involved in any decisions regarding Brown's treatment level, treatment progression, or entries on Brown's treatment chart. Brown has not submitted evidence that contradicts this evidence. The evidence further demonstrates that the NRC has certain safety protocols in order to monitor the whereabouts and safety of its patients. It is NRC policy that all patients must be accounted for at all times, and patient counts are performed throughout the day. The nursing service staff conduct a check of each patient's whereabouts a minimum of once every 30 minutes and record this information. Although Brown may not have welcomed such supervision and monitoring, there is no evidence that Brown was treated differently than other patients regarding supervision and monitoring because she filed Case No. 8:16CV569. Furthermore, Brown has provided no evidence that she suffered negative consequences as a result of any charting or monitoring of her activities. Clearly, any charting or monitoring did not deter Brown from filing this lawsuit.

keep calling you Cornelius," the evidence shows that Herian was not at work at the NRC on that date.

The evidence also establishes that, as a member of the NRC administration, Kroll denied one purchase order request for silicone bra inserts submitted by Brown due to safety and security concerns, not due to Brown's filing Case No. 8:16CV569. The NRC administration was concerned a silicone bra would draw more attention to Brown and would place Brown's safety and security at risk from other patients. The NRC administration was also concerned the request would interfere with the treatment of other patients. Brown has not presented evidence that Kroll denied or ignored any other purchase order requests. While the court notes Brown's disappointment and frustration of being denied silicone bra inserts, Brown fails to present evidence that the denial is sufficiently intimidating to chill the speech of a person of ordinary firmness. Indeed, Brown has filed this lawsuit.

Finally, the evidence establishes that Kroll had no motivation to prevent Brown from engaging in a constitutionally protected activity. Kroll knew Brown had a right to file lawsuits and did not care whether Brown exercised that right.

### **Waggoner**

There is no evidence that Waggoner wrote negative entries and low treatment scores in Brown's treatment plan or forwarded negative untrue entries to the mental health board in retaliation for Brown's filing Case No. 8:16CV569. The evidence demonstrates that, during her time as a group facilitator, Waggoner did participate in the scoring of Brown's treatment plan and sometimes made entries on Brown's chart regarding treatment progress. Waggoner's treatment plan scoring and entries, however, were not intended to be "low" or "negative." The purpose of the scoring and entries was to review Brown's treatment plan and report the progress Brown had made in group therapy treatment. Waggoner reported that Brown's progress in group therapy treatment had improved during her involvement. There is no evidence that Waggoner forwarded any entries or scoring to the mental health board on her own. The evidence shows that, approximately every two months, Waggoner and the other group facilitator would submit a

synopsis of Brown's group therapy treatment progress to the treatment team. The entire treatment team would then work together on treatment plan scoring before submitting it to the mental health board. Brown has submitted no evidence that any entries forwarded to the mental health were untrue.

Brown has not presented any evidence that Waggoner's treatment scoring and entries were related to Brown's filing Case No. 8:16CV569. Brown's disagreement with any treatment scoring or entries does not establish that those scoring and entries were untrue or were made in retaliation of Brown exercising her First Amendment rights. There is no evidence Brown suffered negative consequences as a result of Waggoner's entries or scores in her treatment plan or that any action of Waggoner prevented Brown from filing this lawsuit. Finally, there is no evidence that Waggoner was motivated to take adverse action based on Brown's filing Case No. 8:16CV569. Indeed, Waggoner knew Brown had a right to file lawsuits and did not care whether Brown exercised that right.

### Summary

To survive summary judgment on her retaliation claims, Brown must present evidence of a causal connection between constitutionally protected activity and an adverse action. There is nothing to show any action of Defendants Herian, Kroll, and Waggoner was at all motivated by Brown's engagement in an activity protected under the First Amendment. Brown simply presumes retaliation based on nothing more than conclusory statements. There is no evidence any of these Defendants treated Brown any differently than any other NRC patient due to Brown's exercise of constitutional rights.

### E. Conclusion

The court finds that Brown's claims against each Defendant fail as a matter of law. "If the court finds no constitutional violation occurred, the analysis ends and the issue of qualified immunity is not addressed. . . . This is not to say,

however, the defendant official is entitled to qualified immunity. Rather, if no constitutional violation occurred, plaintiff's claim fails as a matter of law because plaintiff did not prove an essential element of the § 1983 claim." *Ambrose v. Young*, 474 F.3d 1070, 1077 n.3 (8th Cir. 2007) (citations omitted). Alternatively, because there was no constitutional violation, each Defendant is entitled to qualified immunity. *See Payne v. Britten*, 749 F.3d 697, 707 (8th Cir. 2014) ("For example, a district court could begin and end with the first question, granting qualified immunity because there was no constitutional violation.").

IT IS THEREFORE ORDERED that:

1.    Defendants' Motion for Summary Judgment (Filing No. 11) is granted.

2.    Plaintiff's Motion for Summary Judgment (Filing No. 22) is denied.

3.    Defendants' Motion to Strike (Filing No. 26) is denied.

4.    A separate judgment will be entered.

Dated this 24th day of May, 2018.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge